IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| DAVID KENTON STRUNK | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No.: _____ |
| POWELL-CLINCH UTILITY DISTRICT and ROBERT W. NEIL | ) | |
| Defendants. | ) | |

## COMPLAINT

Comes the Plaintiff David Kenton Strunk and sues the Defendants Powell-Clinch Utility District and Robert W. Neil and for his cause of action states as follows:

1. Plaintiff David Kenton Strunk ("Mr. Strunk" or "Plaintiff") is a citizen and resident of Scott County, Tennessee.

2. Defendant Powell-Clinch Utility District ("PCUD" or "Defendant") is a public corporation created pursuant to T.C.A. §§ 7-82-101, *et seq.* and has the power to "sue and be sued." T.C.A § 7-82-304(a). PCUD may be served with process through its Chief Managing Agent, Robert W. Neil, 203 First Street, Lake City, Tennessee 37769.

3. Defendant Robert W. Neil ("Mr. Neil") is the President of PCUD and is a citizen and resident of Knox County, Tennessee. Mr. Neil may be served with process at 203 First Street, Lake City, Tennessee 37769.

4. PCUD is an employer subject to the provisions of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201 *et. seq.* and the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304 ("TPPA").

5. Plaintiff brings this action for legal relief to address his unlawful termination in violation of the state common law, the TPPA, 42 U.S.C. § 1983 (First Amendment of the United States Constitution) and FLSA; retaliatory harassment; and to remedy violations of the wage provisions of the FLSA. Plaintiff also brings this civil action for PCUD's repeated violations of the Open Meetings Act, Tenn. Code Ann. §§ 8-44-101, *et seq.*

6. This court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331, 29 U.S.C. § 216, and 28 U.S.C. § 1367 for the TTPA and common law retaliatory discharge claims and the Open Meetings Act claims. The venue is proper in the Eastern District of Tennessee pursuant to 28 U.S.C. § 1391(b) and (c).

7. Mr. Strunk was employed by the Defendant for the purposes of this civil action from May 2001 until his termination on February 9, 2012.

8. At all times material to this action, Mr. Strunk was an "employee" of PCUD as defined by Section 203 of the FLSA and Section 304 of the TPPA and worked for PCUD within the territory of the United States within the three year period preceding the filing of this lawsuit.

9. PCUD and Mr. Neil are each an "employer" as defined by Section 203 of the FLSA and PCUD is an "employer" as defined by Section 304 of the TPPA. Further, Mr. Neil had supervisory authority over Mr. Strunk's wages and made the decision to dock his salary as discussed below.

10. The overtime provisions set forth in Section 207 of the FLSA govern the business operations and activities of and apply to PCUD and Mr. Neil.

11. Mr. Strunk was hired by PCUD in May 2001 as an accountant. He was promoted to Controller on or about July 1, 2006. Mr. Strunk regularly worked sixty to sixty-five hours per week for PCUD. Mr. Strunk never received overtime compensation from PCUD. Mr. Strunk's position was incorrectly classified as exempt because his salary was subject to deduction based on the quantity or quality of work performed, thus he was not truly paid on a salary-basis as required by 29 C.F.R. § 541.602 to satisfy one of the white collar exemptions to the FLSA.

12. Del Roberts ("Mr. Roberts"), who was the Vice-President of Finance, was promoted to President and became Mr. Strunk's immediate supervisor in August 2006. Richard McIntosh ("Mr. McIntosh") is the Vice-President of Operations. The Board of Directors, who are self-appointed, are Charles Taylor ("Mr. Taylor"), Jerry Shattuck ("Mr. Shattuck"), and Charles Oldham ("Mr. Oldham").

13. Mr. Roberts used the district's credit cards for personal expenses and charged them to his "143 account." A "143 account" is intended as a benefit to PCUD employees to allow them to purchase natural gas appliances and pay them off over time. Mr. Roberts, however, used his "143 account" as a personal piggy bank at the expense of the rate-payers of the district. Indeed, when Mr. Strunk was promoted to Controller, Mr. Roberts's "143 account" balance was already $30,000.00. That balance was allowed to accumulate by the Board of Directors during the time Mr. Roberts served as PCUD's Vice-President of Finance.

14. By 2009, Mr. Roberts's "143 account" balance had risen to $90,000.00. The Board of Directors and Mr. McIntosh were complicit in allowing this to happen as they approved payment of

3

Mr. Roberts's credit card bills. Mr. Roberts was using PCUD's credit cards and his "143 account" to pay for his children's tuition, meals, and personal travel expenses. Mr. Strunk spoke to Mr. Roberts about the balance in his "143 account," and he always said he would take care of it and the Board of Directors did not mind what he was doing. Indeed, it was later learned that the Board of Directors were engaged in their own financial irregularities regarding travel expenses, mileage reimbursement, payment of extravagant meals and parties, and their compensation.

15. Mr. Strunk reported "143 account" balances annually to PCUD's outside accountant; and, in 2009, Mr. Strunk talked specifically with the accountant about the serious issues with Mr. Roberts's balance. The accountant then went to Mr. Roberts and discussed the balance with him. The accountant also noted the balance as a concern in the 2009 audit which was presented to the Board of Directors at its January 2010 meeting. Mr. Strunk also called Mr. Taylor and brought this balance to his attention. Mr. Taylor and the Board did nothing in spite of the accountant's and Mr. Strunk's warnings about the "143 account" balance. Indeed, the Board of Directors awarded a $20,000.00 bonus to Mr. Roberts on January 21, 2010 to apply against the "143 account" balance.

16. In the summer of 2009, Mr. Strunk hired a new accounts payable clerk, Suzanne Patterson ("Ms. Patterson"). The former clerk was close to Mr. Roberts and his assistant. Mr. Strunk wanted someone he could trust monitoring the credit card bills. Shortly after assuming her duties, Ms. Patterson advised Mr. Strunk that Mr. Roberts was charging extravagant personal meals as business expenses. Mr. Strunk also learned that Mr. Roberts was receiving 54 payroll checks instead of 52.

17. In late 2009, it became clear to Mr. Strunk that the Board of Directors, Mr. McIntosh, and Mr. Roberts were complicit in the financial improprieties that were occurring at PCUD, so

4

Mr. Strunk contacted the State of Tennessee Comptroller's office (the "Comptroller"). Mr. Strunk called Dennis Dycus ("Mr. Dycus"), the Director of Municipal Audit, and told him about Mr. Roberts's "143 account" balance, the 54 paychecks, petty cash fraud, a $7,000.00 write-off of the account balance as "obsolete," and sick and vacation leave payments to the account. Mr. Dycus said this is a problem, and we will send auditors to look into the matter.

18. Tenn. Code Ann. 8-5-503 provides that "public officials [who] believe unlawful conduct has occurred [at public utilities] shall report the information in a reasonable amount of time to the office of the Comptroller of the treasury." Further, Mr. Strunk's reporting Mr. Roberts's conduct to the Comptroller is protected speech under the First Amendment of the U. S. Constitution.

19. Auditors from the Comptroller's office arrived in early February 2010 and began an investigation into the financial irregularities Mr. Strunk complained about to Mr. Dycus. The auditors worked one week on their initial visit, and returned periodically over the next few months for two or three days at a time. The auditors worked very closely with Mr. Strunk and his staff on each visit. Ms. Patterson was very involved in helping the auditors and criminal investigator discussed herein.

20. On or about May 4, 2010, an employee meeting was called and Mr. Roberts announced he was resigning effective May 14, 2010. After Mr. Roberts spoke, Mr. Taylor addressed the meeting and said PCUD will fire the person who called in the state auditors. The Board of Directors also released a statement saying "all amounts" debited against Mr. Roberts in those accounts are being reimbursed in full by him. That statement is not true. Mr. Roberts has not repaid all of the money he owes to PCUD. Mr. McIntosh was named the interim President. On or about May 9, 2010, Mr. McIntosh called Mr. Strunk to his office and said he has issues with the

5

Case 3:12-cv-00114 Document 1 Filed 03/09/12 Page 5 of 20 PageID #: 5

auditors being there and was suspicious that someone close to the situation called the state. The meeting was cut short when one of the state auditors asked Mr. Strunk to step out so he could meet with Mr. McIntosh. On May 12, 2010, Mr. McIntosh called Mr. Strunk back to his office and told him that either Mr. Strunk or the former President, James Smith, called the Comptroller's office. Mr. McIntosh told Mr. Strunk he would be fired if it was discovered that he reported Mr. Roberts to the state.

21. In early June 2010, the Comptroller's office submitted a draft of its audit to the Board of Directors for comment. The final report was released on October 18, 2010. A copy of the report is attached as **Exhibit A**. The audit revealed the following:

> Del Roberts, paid his personal credit card charges totaling at least $79,816 with district funds. Our investigative audit further revealed that on June 23, 2009, Mr. Roberts instructed the payroll clerk to advance him his weekly payroll payment of $1,836. Auditors also identified $4,650 in travel advance checks payable to Mr. Roberts that were used primarily for his personal benefit. Mr. Roberts provided misleading and incomplete information to board of commissioners resulting in $20,000 bonus. Mr. Robert incurred $95,059 in personal expenses to the utility district. This matter has been referred to the local district attorney general.

In spite of these findings, the Board of Directors hired Mr. Roberts back as a consultant and provided him access to PCUD's records and files. PCUD also continued to pay Mr. Robert's cell phone bill and allowed him to stay on the group health insurance plan through September 2010. Mr. Roberts resumed working for PCUD in June, 2010. He worked there three months and earned several thousand dollars for his "consulting work." Mr. Roberts was indicted by the Anderson County Grand Jury on December 6, 2011 for theft (Class B Felony) and Fraudulent Use of Credit/Debit Card (Class B Felony). The Attorney General released a statement concerning the "operation and

6

management" of PCUD on February 23, 2011. The statement expressed "disappointment" that to date, management of PCUD "seems to have been more focused on who told on them than on correcting the problem."

22. The Comptroller's audit also resulted in other findings and recommendations related to PCUD's operations, to wit:

1. Failure to establish and follow policies regarding credit cards
2. District policy violated by former district president's sale of leave
3. Commissioners received improper payment in lieu of group insurance
4. Accommodation to commissioners resulted in unnecessary travel costs
5. Natural gas bill adjustment justification not documented
6. Violation of district reimbursement of expense policy
7. Personal use of vehicle as a fringe benefit not reflected on employee's Form W-2
8. Failure to mark or identify all district vehicles
9. Lack of policy establishing reasonable expenses
10. Abuse of petty cash fund
11. Violation of employee purchase provision of handbook

23. As stated in the audit report, the Comptroller's office referred its findings to the District Attorney General's office for investigation. The Anderson County District Attorney was assigned to the case. Anderson County Investigator Bobby Joe Higgs ("Mr. Higgs") was made the lead investigator. Mr. Higgs met with Mr. Strunk on September 2, 2010 as part of the criminal investigation. Mr. Higgs told Mr. Strunk that Higgs may have messed up because he contacted Mr. McIntosh's office on August 27, 2010 and asked McIntosh's assistant if Mr. Strunk is a Board Member because his name is in the file. Mr. Higgs was fearful that he had inadvertently disclosed Mr. Strunk's identity as the whistle-blower. Indeed, that was what happened. Mr. McIntosh immediately put into place a plot to paper Mr. Strunk's personnel file with pretextual "concerns." Indeed, on August 27, 2010 at 4:20 p.m., the same day Investigator Higgs called McIntosh's office,

7

Mr. McIntosh's assistant, Melissa, began preparing a document named "Mustang." The "Mustang" document is a list of "concerns" related to Mr. Strunk's performance. Mr. McIntosh met with Mr. Strunk on August 31, 2010 to go over the list of "concerns." Mr. McIntosh stated he was going to give the list to the Board of Directors and did not know what they would do with it.

24. Mr. Strunk had an exemplary work record until Mr. McIntosh created the "Mustang" document. Indeed, there were no prior disciplinary write-ups or negative performance evaluations in his personnel file until after Mr. Higg's called Mr. McIntosh's office and inadvertently disclosed Mr. Strunk as the whistle-blower.

25. On September 3, 2010, Mr. Strunk's counsel sent a letter to the Board of Directors and Mr. McIntosh to advise them not to terminate or harass Mr. Strunk for complaining about illegal activities to the Comptroller's office. The letter was ignored. Mr. Strunk also filed a harassment complaint with the Human Resources Department, but nothing was done. Indeed, Mr. Strunk was subjected to a continuing practice of harassment and retaliation at PCUD until his termination.

26. Just before the Board of Directors meeting on September 30, 2010, Mr. McIntosh gave the "Mustang" document to Mr. Strunk and asked him to prepare a written response to each allegation. Mr. Strunk did so through his attorney on October 18, 2010. On October 29, 2010, PCUD's attorney, Herb Williams ("Mr. Williams") e-mailed Mr. Strunk and Mr. McIntosh to inquire about "employee benefits" that were not provided for in the employee handbook. This was an issue raised in the Comptroller's audit. Mr. Strunk responded to Mr. Williams on November 1, 2010, and identified several issues, including the fact that Mr. McIntosh was using "company assets for personal benefit." Mr. Strunk stated that Mr. McIntosh had purchased several hundred feet of water line and fittings through PCUD and had ordered PCUD employees to install the line on his property.

Mr. Strunk also reported that Mr. McIntosh had used a company bobcat to install water drains and to do some landscaping work on his property.

27. The Board of Directors discussed Mr. Strunk's allegations against Mr. McIntosh when it met on November 22, 2010. The Board stated it did not see a problem and dropped the issue. Mr. Strunk subsequently brought those allegations to the attention of Investigator Higgs. The Anderson County District Attorney General took the allegations to the Grand Jury on December 6, 2011. Mr. McIntosh was indicted for Theft of Services (Class D Felony). PCUD took no action against him. Indeed, Mr. McIntosh is still gainfully employed there. Mr. Strunk's actions in reporting Mr. McIntosh's conduct is protected speech under the First Amendment of the U.S. Constitution and the TPPA.

28. In late fall 2010, the Board of Directors started interviewing applicants for the President's position. Mr. Strunk had applied for the position, but he was not granted an interview in retaliation for his complaints about the illegal activity at PCUD. The Board met in secret on several occasions between August 2010 and January 2011 to conduct interviews for the position. Indeed, on the evening of January 6, 2011, two Board Members drove their wives' cars to the PCUD office after work hours to meet with Mr. McIntosh and Mr. Neil to discuss hiring Neil as the new President. No notice of this meeting was provided to the public and no minutes were kept of this meeting in violation of the Open Meetings Act.

29. On January 27, 2011, the Board of Directors held its monthly meeting. Mr. Strunk and Melissa Roberts, who takes the minutes, were ordered to leave the meeting. The Board then met in secret and voted to hire Mr. Neil as PCUD's new President in violation of the Open Meetings Act. Someone later changed the minutes to reflect a public vote regarding the hiring of Mr. Neil. The

9

Case 3:12-cv-00114 Document 1 Filed 03/09/12 Page 9 of 20 PageID #: 9

Board of Directors also ordered its new outside accounting and audit firm, Work & Greer, PC ("W&G") to alter the annual audit report. For instance, W&G recommended PCUD "implement a whistleblower program whereby employees can report (anonymously) unethical behavior to the District's attorney." The Board ordered W&G to remove the word "whistleblower" from its final report. The Board also ordered W&G to not mention a finding related to a Board Member justifying a mileage reimbursement request for driving to California by comparing the cost of driving to a first class airline ticket. W&G identified that impropriety in a draft memorandum, but the Board ordered that it not be included in the final report.

30. After assuming his duties as President, Mr. Neil began papering Mr. Strunk's file with pretextual write-ups. Mr. Neil docked Mr. Strunk's salary on May 4, 2011 for answering an employee's question about bonuses that were due that month. Mr. Neil claimed the issue of compensation is "confidential" and "should not be discussed with anyone." Mr. Strunk complained to Mr. Neil that the docking of his pay is illegal under the FLSA and under Section 8(a) of the National Labor Relations Act, but Mr. Neil refused to reverse his decision. Mr. Strunk had never been disciplined for answering questions about compensation from employees before he contacted the Comptroller's office about illegal activity at PCUD. The docking of Mr. Strunk's salary was retaliation, but also establishes he was paid based on the quantity or quality of his work and not on a salary-basis. 29 C.F.R. § 541.602.

31. The Comptroller's office previously released a scathing audit report on October 25, 2010, about other financial irregularities at PCUD. This report centered around the Board of Directors spending "$10,729 to send three district employees and their spouses/guests on a 2009 trip to an exotic all-inclusive resort in . . . Costa Rica." There they spent over $2,000 on horseback

riding. The Comptroller's investigation determined this trip was "essentially a vacation" although the Board called it a "promotional trip" to encourage builders "to install natural gas appliances."

32. In response to this audit, the Board of Directors issued a public statement that it required the employees who went on the trip to reimburse PCUD for the travel costs of their spouses. Those employees were Mr. McIntosh and Robin Profitt ("Ms. Profitt"), and they did reimburse the district. The Board of Directors turned around and gave the money back to them in the form of a "bonus" in a secret meeting in violation of the Open Meetings Act. The bonus to Mr. McIntosh was called a longevity bonus and the bonus to Ms. Profitt was for "additional education" she had received. Her classes were completed, however, years before the bonus was issued on October 4, 2011. Mr. McIntosh and Ms. Profitt received the illegal bonuses and kept them. They are still employed by PCUD. Mr. Strunk, on the other hand, did nothing illegal and was later terminated.

33. On or about June 15, 2011, the State of Tennessee Utility Management Review Board filed an ouster petition against PCUD's Board of Directors. The petition is based on the Board's complete disregard of its fiduciary responsibility to the rate-payers of the district and for their own financial improprieties, including improper reimbursement for travel, lack of proper documentation, and extravagant parties. The petition is also based on the Board's "retalia[tion] against the individual who initially contacted the Comptroller's office... and [because] [t]he Board condoned and continues to allow the informant to be subjected to retaliatory actions at their own hand and the hands of current management." A copy of the petition is attached as **Exhibit B**.

34. The Board used PCUD's attorney and resources to draft responses to the petition and to move to have it dismissed. The Board and PCUD's attorney also routinely met in secret in violation of the Open Meetings Act to discuss the ouster petition and how to defend it. The

11

Administrative Law Judge assigned to the case denied the Board's motions to dismiss the case. The case is currently on appeal to the Davidson County Chancery Court.

35. Mr. Strunk and others from PCUD attended the TGA Finance and Accounting Conference on September 26-27, 2011, in Nashville. Mr. Taylor approached Mr. Strunk during a break near the end of the conference. Mr. Taylor told Mr. Strunk he would have to pay for reporting Mr. Roberts to the Comptroller.

36. On September 28, 2011, Mr. Neil gave Mr. Strunk a negative performance evaluation "for the period ending September 30, 2011." This evaluation was pretextual and further retaliation by PCUD against Mr. Strunk for reporting illegal activity to the Comptroller's office. Indeed, Mr. Strunk had never received a negative "Performance Evaluation" prior to his phone call to the Comptroller's office.

37. In late October 2011, W&G began the annual audit of PCUD's operations. Mr. Strunk worked daily with the auditors, and he was told the books were cleaner and looked better than ever before. On or about January 26, 2012, Mr. Strunk told Mr. McNeil that W&G's auditors told him the books were clean and looked better than ever before. Mr. McNeil said it did not matter and that Mr. Strunk is going to eventually lose his job for reporting Mr. Roberts to the state and for talking to the Attorney General's office. W&G presented the audit to the Board of Directors at its January 2012 meeting and stated that PCUD was receiving an "unqualified audit" which is the best rating an organization can receive. W&G employees also told the Board that the books looked good.

38. On February 9, 2012, Mr. Strunk arrived at work around 7:50 a.m. At 8:30 a.m., Mr. Neil came to his office and asked him to follow him to the Board room. Maria Hooks ("Ms. Hooks"), the Human Resources Manager, was waiting on them. Mr. Neil told Mr. Strunk he

was terminating him because of issues with the 941 returns, W-2's, and the audit. Mr. Strunk was not given an opportunity to say anything, and Mr. Neil handed him a Separation Agreement and Release. Mr. Neil told him he had to sign it immediately or else he would forfeit $15,150.00 in separation pay. The agreement contained a release of Mr. Strunk's claims against PCUD and a provision prohibiting him from "assist[ing] others in commencing, prosecuting or processing any claims or actions against [PCUD]..." In short, PCUD was trying to buy Mr. Strunk's silence in the ouster lawsuit.

39. Mr. Strunk refused to sign the agreement and left the Board room to make a telephone call to his attorney. Mr. Strunk then went to Mr. Neil's office and told him he was going to take it home with him but was probably not interested in it. Mr. Neil then escorted Mr. Strunk back to the Board room with Ms. Hooks. Mr. Neil asked him if he had any equipment, and Mr. Strunk said he had a laptop which he would return. Mr. Neil then instructed him not to talk to anyone and to not destroy the network. Mr. Neil then terminated Ms. Patterson. She was terminated for alerting Mr. Strunk about Mr. Roberts's illegal credit card transactions and for talking to the auditors and Mr. Higgs during their investigations.

40. PCUD threw a party for Mr. Roberts after learning that he stole money from it. PCUD still employees Mr. McIntosh in spite of the fact he is under a felony indictment for financial irregularities related to his employment there. Mr. Strunk, on the other hand, blew the whistle on the financial misconduct of Mr. Roberts and Mr. McIntosh, yet he was terminated and told to carry his personal belongings to his car without assistance. PCUD did not throw a party for Mr. Strunk.

13

Case 3:12-cv-00114   Document 1   Filed 03/09/12   Page 13 of 20 PageID #: 13

41. PCUD engaged in a pattern and practice of violating the Open Meetings Act and of harassment against Mr. Strunk for complaining to the Comptroller's office and talking to the Attorney General's office about illegal activity at the district.

### COUNT I - Violation of FLSA Overtime Provisions
### By PCUD and Mr. Neil

42. Mr. Strunk repeats and incorporates by reference the allegations contained in paragraphs 1 through 41 herein. By its actions alleged herein, PCUD willfully violated the FLSA and corresponding federal regulations by failing to pay Mr. Strunk overtime compensation during his employment. PCUD has willfully and intentionally engaged in a pattern and practice of violating the FLSA as detailed herein, by preventing or endeavoring to prevent the proper compensation of Mr. Strunk in accordance with Section 207 of the FLSA. Mr. Strunk was not paid on a salary-basis. PCUD and Mr. Neil incorrectly classified Mr. Strunk as an exempt employee because his pay was based on the quantity or quality of his work. Indeed, Mr. Strunk's pay was docked by Mr. Neil after he answered questions about employee bonuses. Mr. Strunk worked more than forty hours per week for PCUD without receiving overtime compensation.

43. As a result of PCUD's and Mr. Neil's violation of the FLSA, Mr. Strunk has suffered damages by failing to receive his lawful overtime wages in accordance with Section 207 of the FLSA and 29 C.F.R. § 778.315.

44. PCUD and Mr. Neil made no good faith effort to comply with the FLSA with respect to the compensation of Mr. Strunk, and their failure to pay overtime to Mr. Strunk was willful.

## COUNT II - FLSA Retaliation by PCUD and Mr. Neil

45. Mr. Strunk repeats and incorporates by reference all allegations contained in paragraphs 1 through 44 herein. By its allegations alleged herein, PCUD and Mr. Neil willfully violated the FLSA and corresponding federal regulations by docking Mr. Strunk's pay and terminating his employment for complaining about it to Mr. Neil in violation of § 215(a) of the FLSA.

46. PCUD and Mr. Neil willfully engaged in a pattern and practice of violating the FLSA as detailed herein by preventing or endeavoring to prevent Mr. Strunk from exercising the rights and receiving benefits to which he is entitled under § 207 of the FLSA and by terminating him for complaining about the illegal docking in violation of § 215(a) of the FLSA.

47. As a result of PCUD's and Mr. Neil's violation of the FLSA, Mr. Strunk has suffered emotional distress, and lost tangible job benefits, including the loss of wages and salary, past and future in an amount to be determined at trial.

48. PCUD's and Mr. Neil's conduct as stated herein violates the FLSA 29 U.S.C. § 215(a).

49. PCUD and Mr. Neil made no good faith effort to comply with the FLSA with respect to the rights afforded to Mr. Strunk under the statute, and their conduct was willful.

## COUNT III - Common Law Retaliatory Discharge By PCUD

50. Mr. Strunk repeats and incorporates by reference all allegations contained in paragraph 1 through 49 herein. As an independent, alternative and pendent cause of action, Mr. Strunk avers that a substantial factor in PCUD's decision to discharge him was his exercise of a statutory or constitutional right. *See,* Tenn. Code Ann. § 8-5-503 and U. S. Const. Amend I. Mr.

Strunk also avers that his termination was in violation of clear public policy evidenced by an unambiguous constitutional, statutory or regulatory provision. *Id.*

51. As a result of PCUD's and Mr. Neil's violation of the common law (*Crews v. Buckman Labs Int'l. Inc.*, 78 S.W.3d 852 (Tenn. 2002), Mr. Strunk has suffered emotional distress, and lost tangible job benefits, including the loss of wages and salary, past and future in an amount to be determined at trial.

### COUNT IV - Violation of the TPPA By PCUD

52. Mr. Strunk repeats and incorporates by reference all allegations contained in paragraph 1 through 51 herein. As an independent, alternative and pendent cause of action, Mr. Strunk avers PCUD willfully, knowingly, and/or maliciously violated the TPPA, Tenn. Code Ann. § 50-1-304, by terminating Mr. Strunk for refusing to participate in or remain silent about illegal activities at PCUD.

53. As a result of PCUD's violation of the TPPA, Mr. Strunk has suffered emotional distress, and lost tangible job benefits, including the loss of wages and salary, past and future in an amount to be determined at trial.

### COUNT V - § 1983 (First Amendment Harassment and Retaliation) By PCUD

54. Mr. Strunk repeats and incorporates by reference all allegations contained in paragraphs 1 through 53 herein. As an independent and alternative cause of action, Mr. Strunk avers PCUD willfully, knowingly and/or maliciously harassed and retaliated against him for engaging in constitutionally-protected speed. Mr. Strunk suffered a hostile working environment and was terminated by PCUD to deter Mr. Strunk's free speech rights. Mr. Strunk's free speech was at least a motivating factor in PCUD's harassment and termination of Mr. Strunk.

55. PCUD's conduct, which was undertaken under color of law, as stated herein violates 42 U.S.C. § 1983. As a result of this illegal conduct, Mr. Strunk has suffered emotional distress, and lost tangible job benefits, including lost wages and salary, past and future in an amount to be determined at trial.

**COUNT VII - Violation of the Open Meetings Act By PCUD and Mr. Neil**

56. Mr. Strunk repeats and incorporates by reference all allegations contained in paragraphs 1 through 55 herein. As an independent, alternative and pendent cause of action, Mr. Strunk avers that PCUD and Mr. Neil violated the Open Meetings Act, Tenn. Code Ann. §§ 8-44-101, *et seq.*, by deliberating public business in secret including, but not limited to, the hiring of Mr. Neil, the termination of Mr. Strunk, disciplinary action against Mr. Strunk, audits of PCUD, compensation of employees and directors of PCUD, financial investigations of the Board of Directors and management of PCUD, and the ouster proceeding against the Board of Directors.

57. Mr. Strunk avers that pursuant to Tenn. Code Ann. § 8-44-105, any action taken by PCUD and Mr. Neil at a meeting in violation of the Open Meetings Act shall be void and of no effect; accordingly, Mr. Neil must be removed as President of PCUD, Mr. Strunk's termination declared "void and of no effect," and Mr. Strunk reinstated to his position as Controller.

58. Mr. Strunk has been damaged by PCUD's and Mr. Neil's willful violation of the Open Meetings Act, and he is entitled to reinstatement in addition to back pay and all other remedies provided by law.

## COUNT VIII – Damages

59. Mr. Strunk repeats and incorporates by reference all allegations contained in Paragraphs 1 through 58 herein. As a result of the Defendants' actions as stated above, Mr. Strunk has suffered emotional stress, humiliation and embarrassment, lost tangible job benefits, including the loss of wages and salary, past and future, and has failed to receive all overtime compensation due him under the FLSA. Mr. Strunk is also entitled to reinstatement, liquidated damages, pre-judgment and post-judgment interest, attorneys' fees, costs, and all other compensation and relief permitted under the FLSA, Tennessee common law, the TPPA, 42 U.S.C. §§ 1983 and 1988, and the Open Meetings Act.

## COUNT IX – Punitive Damages Against PCUD

60. Mr. Strunk repeats and incorporates by reference all allegations contained in Paragraphs 1 through 59 herein. As a result of the fraudulent, intentional, reckless, and malicious conduct described herein, Mr. Strunk is entitled to punitive damages in order to punish PCUD for the willful defiance of his rights and for the purpose of deterring PCUD from similar actions in the future. Furthermore, PCUD's conduct was reckless and/or callously indifferent to Mr. Strunk's protected constitutional rights, and/or because PCUD was motivated by evil intent. *Smith v. Wade*, 461 U.S. 30 (1983).

## PRAYER FOR RELIEF

WHEREFORE, Mr. Strunk prays for the following relief:

A. That he be awarded damages in the amount of his unpaid overtime compensation owed to him under the FLSA, plus an equal amount of liquidated damages, prejudgment and post-judgment interest, and other relief permitted by the FLSA and applicable

regulations;

   B. That he be awarded damages including lost wages, salary, employment benefits and other compensation, with interest, plus an equal amount of liquidated damages, punitive damages, prejudgment and post-judgment interest, and front pay (or, alternatively, reinstatement if this court deems that appropriate), emotional distress, humiliation and embarrassment, damages, and other relief permitted by the FLSA for retaliation, state common law, 42 U.S.C. §§ 1983 and 1988, and the TPPA, as a result of his unlawful termination and harassment he suffered at PCUD;

   D. That he be awarded his reasonable attorneys' fees;

   E. That he be awarded his costs, expert witness fees, and expenses incurred in this action;

   F. That the court enter an injunction prohibiting Defendants from future violations of the FLSA and the Open Meetings Act; and, that the Court declare void and of no effect all actions taken by PCUD and Mr. Neil in violation of the Open Meetings Act, including but not limited to the removal of Mr. Neil from his position as President of PCUD and the reinstatement of Mr. Strunk to his job as Controller.

   G. A jury to try this civil action; and

   H. Such other further legal and equitable relief to which he may be entitled.

Respectfully submitted,

/s/Robert L. Bowman
Robert L. Bowman (#017266)
William J. Carver (#022718)

Post Office Box 629
Knoxville, TN 37901-0629
rlbowman@kramer-rayson.com
Telephone: 865.525.5134
Attorneys for Plaintiff

## NOTICE OF CONSENT

Pursuant to 29 U.S.C. § 216(b), this is my written consent to be a party in this civil action.

_____
DAVID KENTON STRUNK

Date: 3/8/2012

20